# History of Appointments to the Supreme Court

[The memorandum which follows, prepared by the Office of Legal Counsel at the request of the Attorney General, surveys four general aspects of the process of appointing Justices of the Supreme Court: (1) the qualities Presidents have sought in Supreme Court nominees; (2) the process of recruiting and evaluating potential appointees prior to nomination; (3) the manner in which the Senate fulfills its responsibilities in the appointment process; and (4) the relationship between the process of choosing a candidate and a successful candidate's eventual performance on the Court. The memorandum pays special attention to the roles played in the appointment process by the Attorney General and the Department of Justice.]

March 5, 1980

MEMORANDUM FOR THE ATTORNEY GENERAL

## I. Introduction

Aspirants to the Supreme Court, unlike presidential, vice-presidential, and congressional candidates, are subject to no constitutional limitations regarding age, citizenship, or residency. No statute requires that Justices even be lawyers, although every nominee so far has met this criterion. Congress has considered bills to limit Supreme Court appointments either to persons under a particular age or to candidates with prior judicial experience; no such limitation has ever been enacted. The history of Supreme Court appointments is consequently a history of presidential discretion limited formally only by the Senate confirmation process, which also proceeds without direct constitutional guidance.

In response to your request, this Office has surveyed some of the vast literature relevant to the history of Supreme Court appointments.[1] We have addressed four general questions: What qualities have Presidents sought in Supreme Court nominees? How are potential appointees recruited and evaluated prior to nomination? How does the Senate fulfill its responsibilities in the appointment process? Is there a predictable relationship between the process of choosing a candidate and a successful candidate's eventual performance on the Court? In surveying the history of nominations and appointments, we have paid special attention

[1] Secondary sources are cited in footnotes by author and page number; a bibliography indicating the full citation for each source is appended to this memorandum. We found the most useful general review of the history of Supreme Court appointments to be H. Abraham, Justices and Presidents: A Political History of Appointments to the Supreme Court (1974).

to the roles played in these processes by the Attorney General and the Department of Justice.

No one formula for choosing the "best" Supreme Court Justice can be deduced from a historical survey. Who are the best candidates with respect to any particular vacancy will depend on a host of factors, including the President's political philosophy, his perceptions of the role of the Court in American government, the crucial issues facing the nation at a given moment in history, and the Court's changing institutional needs. Neither can a Justice's post-appointment performance be predicted with entire confidence based on his pre-appointment career. The uniqueness of the Court's institutional role, the wide range of vital questions that the Justices adjudicate, and the need for each Justice to collaborate with eight others in reaching what often are controversial results, all necessarily affect any appointee's eventual record in the decision of cases. The aim of this memorandum is consequently not to elaborate, in any definitive way, how a great Justice might now be chosen; its aim is to identify the range of issues of which the President at least ought to be aware in exercising his discretion, and which this Department should consider if it is to be helpful in the appointment process.

## II. The Presidents' Criteria

Under Article II, § 2, clause 2 of the Constitution, the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . judges of the Supreme Court. . . ." All but four Presidents—the exceptions so far including President Carter—have successfully nominated at least one Supreme Court Justice. Presidents have sometimes made their selection criteria explicit. George Washington, for example, insisted on support of the Constitution, distinguished Revolutionary service, active political involvement, prior judicial experience, geographic "suitability," and either a good general reputation or personal ties with the President himself.[2] More often, the criteria have been tacit and ad hoc. It is possible, however, based on the history of, 104 successful Court appointments,[3] to examine certain factors that have weighed to some degree in all nominations.

### *A. Ability and Character*

President Herbert Hoover asserted that his Supreme Court appointees were "chosen solely on the basis of character and mental power,"[4] and every President, in explaining his nominations publicly,

[2] Abraham at 64.

[3] The 104 successful appointments include three successful "promotions" of Associate Justices to the post of Chief Justice. The total number of persons to have served so far in the Court is 101. Abraham at 46–47.

[4] Teger at 46.

has cited ability and character among his criteria for selection. Some minimum of each is thus a *sine qua non* for a successful appointment. The appropriate measure of "objective" merit, however, especially regarding judicial ability, may vary with the needs of the country and of the Court when a vacancy occurs. With respect to some appointments, the Court's greatest need may be an exceptional intellectual leader, with or without extensive political or administrative experience. At other times, the Court may need a catalytic administrator or an effective advocate more than it needs a truly brilliant thinker. An ideal candidate, of course, would be both intellectually gifted and politically effective; the balance of these talents is likely, however, to vary even within the pool of the nation's best candidates.

Because the number of capable individuals is much greater inevitably than the number of places to be filled, few nominations have occurred in which a candidate's outstanding ability alone appears to have decided his nomination. There are, however, exceptions. Although President Hoover wanted a "non-controversial western Republican" to succeed Oliver Wendell Holmes,[5] he was persuaded by a long list of labor and business leaders, scholars, and Senators that Chief Judge Benjamin N. Cardozo of the New York Court of Appeals was the only fit successor. The final straw breaking Hoover's resistance appears to have been the emphatic endorsement of Senator William E. Borah of Idaho, the Republican chairman of the Foreign Relations Committee, who reportedly told Hoover, "Cardozo belongs as much to Idaho as to New York," and "[g]eography should no more bar the judge than the presence of two Virginians—John Blair and Bushrod Washington—should have kept President Adams from naming John Marshall to be Chief Justice." [6] When reminded that a Jewish Justice, Louis Brandeis, already sat on the Court, Borah said, "Anyone who raises the question of race [sic] is unfit to advise you concerning so important a matter." [7] A similar chorus of support induced President Roosevelt to appoint Felix Frankfurter as Cardozo's successor. Roosevelt, like Hoover, wanted a Westerner on the Court, although, had he found one to succeed Cardozo, Frankfurter—already a Roosevelt adviser—likely would have received a subsequent Roosevelt nomination.

Not only is objective merit rarely the decisive criterion, but some of the nation's greatest Justices were apparently chosen without obvious primary regard for their intellectual potential. Joseph Story, for example, who probably ranks second only to John Marshall in his impact on American law, was the fourth nomination submitted by President Madison for the seat after two confirmed appointees (Levi Lincoln and John Quincy Adams) had declined the position and a third nominee had

---

[5] Abraham at 191.
[6] Abraham at 192.
[7] Abraham at 192.

been rejected by the Senate. In the end, it is uncertain what led Madison to Story, although it is known that Story's uncle was a close friend of the President.[8]

Conversely, some candidates whose pre-appointment careers promised considerable success based on objective merit performed with little distinction once appointed. The clearest recent example is Charles Evan Whittaker, an outstanding commercial lawyer from Missouri, who had served briefly on both the U.S. District Court and Court of Appeals, and who had won the strong support of Attorney General Brownell. President Eisenhower appointed Whittaker to the Supreme Court in 1957; he resigned 5 years later with few significant Supreme Court opinions to his credit.[9]

To a President interested in demonstrated merit, prior judicial experience may appear a useful index. Fifty-eight of the 101 individuals to serve on the Supreme Court had served earlier on a state or on a lower federal tribunal. This asset, in this century, appears to have appealed more to Republican than to Democratic Presidents. Of the 23 individuals with prior judicial experience appointed to the Supreme Court since 1900, only eight were appointed by Democrats, although, of the 44 persons named to the Court in this century, Democrats have named 18. The 43 persons to serve without prior judicial experience on the Supreme Court since its inception include John Marshall, Joseph Story, Roger Taney, Charles Evans Hughes, Louis Brandeis, Harlan Fiske Stone (when appointed Associate Justice), Felix Frankfurter, William Douglas, Robert Jackson, and Earl Warren—a list that clearly demonstrates the absence of any necessary correlation between judicial experience and capacity for distinguished service.

Presidents have not viewed judicial service as a prerequisite to nomination. However, all but one of the 101 persons to sit on the Court reached the Court after careers in politics or public service of some sort.[10] Although a record of judicial service may be helpful in facilitating an assessment of a candidate's performance as a legal thinker, Presidents appear historically to have been at least as concerned with a person's demonstrated acquaintance with the nation's needs and public processes, and sustained prior exposure to the pressures of public life. Some history of functioning in a pressurized environment may help assure that a nominee's effectiveness and independence on the Court

[8] Abraham at 79–81.

[9] Abraham at 247–48.

[10] The one exception is George Shiras, Jr., a Pittsburgh corporate lawyer appointed to the Court in 1892 by Benjamin Harrison. All five academicians to reach the Court (four of them appointed by FDR) had considerable experience in public life in addition to their academic backgrounds. Fourteen Attorneys General have been nominated to the Court. Nine were successfully appointed—Taney, Clifford, Moody, McKenna, McReynolds, Stone, Jackson, Murphy and Clark. Two were rejected by the Senate and two withdrew before confirmation. One, Edwin M. Stanton, was confirmed, but died before taking his seat. Abraham at 52; Schmidhauser at 82–83.

will not be overcome by public criticism or the magnitude of the issues that the Court confronts.

*B. Political and Legal Philosophy*

Because intellect is rarely the sole determinant of a Supreme Court nomination, and because most Presidents have attached great importance to the Supreme Court's role in legitimating particular policies or national goals, the acceptability of a candidate's personal philosophy is often another *sine qua non* for nomination. As with "merit," however, what constitutes an acceptable philosophy may depend on the times, on the President's attitude towards the Court, and on a candidate's fitness in other respects. For example, political considerations, such as rewarding partisan activity or defusing potential political opposition, may argue in favor of a particular nomination, although the appointing President could have identified a more personally compatible choice. In the case of Earl Warren, nominated by President Eisenhower for the Chief Justiceship in 1953, the President was likely impressed by Warren's political and administrative experience and skill, his positions on particular issues (such as the 1937 Court-packing bill and the 1952 steel seizure case), and his campaign service both to Eisenhower and to Thomas E. Dewey before him. However, Warren was also obstructing the takeover of California Republican politics by more partisan leadership, including Vice-President Nixon. Perhaps, had it not been for this last factor, Eisenhower would have turned to Governor Dewey or to Chief Justice Vanderbilt of the New Jersey Supreme Court for the vacant post.[11] In any event, Eisenhower did not know Warren's philosophy well (he sent Attorney General Brownell to interview him before the nomination), and disagreed with the philosophy eventually manifested in Warren's decisions.

At particular times in history, the importance of a single issue to the nation's welfare or to a President's program has seemed so great that a candidate's position on that issue, rather than his philosophy as a whole, became the litmus test of his acceptability. Obvious examples include the cause of Unionism under Lincoln, the constitutionality of greenbacks as legal tender under Grant, and the legitimacy of extensive government regulation under Franklin Roosevelt. The single-issue test, however, hardly guarantees a particular justice's pattern of thought. For example, the fervent antitrust position of Attorney General James Clark McReynolds undoubtedly recommended the idea of his nomination highly to President Wilson. However, once on the Court, McReynolds proved to be an unabashed conservative, and virtually all of his other positions were opposed to Wilsonian progressivism.

[11] Abraham at 235–37.

Consequently, those Presidents most deeply interested in appointing politically compatible Justices have focused neither on single-issue positions, nor on partisan identification, but on the overall pattern of a candidate's values and opinions. As explained by Theodore Roosevelt to Senator Lodge, in a much-quoted 1906 letter discussing the potential appointment of Justice Lurton: "[T]he nominal politics of the man has nothing to do with his actions on the bench. His *real* politics are all important." [12]

The clearest recent expression of this approach to the selection of Supreme Court justices was offered by Presidential candidate Nixon, in discussing what he would do to replace Chief Justice Warren:

> The President cannot and should not control the decisions of the Supreme Court. . . . There are two important things I would consider in selecting a replacement to the Court. First, since I believe in a strict interpretation of the Supreme Court's role, I would appoint a man of similar philosophical persuasion. Second, recent Court decisions have tended to weaken the peace forces as against the criminal forces in this country. I would, therefore, want to select a man who was thoroughly experienced . . . in the criminal laws and its [sic] problems.[13]

Nixon said he wanted:

> strict constructionists who saw their duty as interpreting and not making law. They would see themselves as caretakers of the Constitution and . . . not super-legislators with a free hand to impose their social and political viewpoints on the American people.[14]

When they are measured against these standards, there is no reason to think that, on balance, Nixon would be disappointed with his appointees' performances on the Court. The most obvious exception may be Justice Blackmun's decision in the abortion cases, a decision no one could likely have anticipated.[15] Chief Justice Burger also has written or joined in strong pro-integration decisions.

One reason why a nominee's performance may eventually surprise the President who appointed him is the potential confusion, in the recruitment process, between a candidate's political and judicial philosophies. Franklin Roosevelt, for example, wanted ardent New Deal supporters on the Court. One such clear supporter was Felix Frank-

---

[12] Schubert at 40.

[13] Ashby at 366, (quoting *Congressional Quarterly Almanac*, 91st Cong., 1st Sess. (1969) at 130).

[14] *Id.*

[15] It should also be noted that Nixon's ability to appoint a personally compatible Justice was most sharply curtailed by the time he nominated Justice Blackmun, because the failure of the Haynsworth and Carswell nominations made it politically necessary to locate a noncontroversial moderate. Abraham at 9.

furter. The central theme, however, of Justice Frankfurter's judicial philosophy proved to be judicial restraint. He believed that the constitutional distribution of powers among the branches of the federal govenment and between the federal and state governments required the Court to avoid decisions that he deemed merely the imposition of its own value choices on political authorities who were constitutionally empowered to decide the same value questions differently. This deference to the elected branches enabled Frankfurter, as a Justice, fully to support the New Deal legislative program. However, Frankfurter's record in interpreting the Bill of Rights would appear far less libertarian than that of other FDR appointees, especially Douglas, Black, and Murphy, despite similar *personal* philosophies, because his judicial philosophy was so much less expansive.

In this vein, it should especially be noted that shorthand labels for candidates' philosophies can be misleading. President Nixon advocated "strict constructionism," but appointed at least one Justice, William Rehnquist, whose clear views of the constitutionally mandated distribution of powers, like most theories on the subject, is not compelled either by the language of the Constitution or by judicial precedent. For this reason, Rehnquist, though politically conservative, has been viewed by some as a judicial activist.[16] Conversely, Hugo Black, generally considered one of the nation's greatest liberal jurists, reached strongly libertarian results through "strict construction" of the First Amendment.[17]

A President should also recognize, if his aim is to affect the general direction of Court decisions, that his purpose can not always be best accomplished by an intellectually gifted person adhering unwaveringly to the President's or to any other doctrinaire point of view.[18] Critical to any Justice's potential influence is his ability to function effectively in a collegial decisionmaking context. Because a Supreme Court Justice is wedded to his colleagues for life, a gift for diplomacy, including a willingness to compromise when necessary, will make his presence more tolerable and his eventual contributions more persuasive. The indicia of political acceptability cannot be viewed wholly apart from the criteria of ability. A record of public or civic service; a strong, confident, and tolerant personality; and a mature temperament joined with legal ability and intellect mark not only the gifted potential judge, but also the effective institutional advocate.

---

[16] *See generally* Shapiro, *Mr. Justice Rehnquist: A Preliminary View*, 90 Harv. L. Rev. 293 (1976).

[17] Rubin, *Judicial Review in the United States*, 40 La. L. Rev. 67, 77 (1979).

[18] For a highly elaborate, mathematically based theory for guiding Presidents in the selection of Justices who will influence Court dispositions, *see* S. Teger, *Presidential Strategy for the Appointment of Supreme Court Justices* (1976) (unpublished U. of Rochester Ph.D. thesis, Library of Congress).

*C. Enhancing the Representativeness of the Court*

In narrowing the pool of potential nominees, Presidents have frequently considered what category of individuals might enhance public perceptions of the "representativeness" of the Court. The primary measure of representativeness, as pursued by the Presidents, has been geographical. Although the Constitution does not require regional balance, a desire for it underlies, in part, the constitutional designation of the President to nominate Supreme Court Justices. It is recorded that, during the debate on this provision, James Madison urged the Constitutional Convention, "The Executive magistrate would be considered as a national officer, acting for and equally sympathizing with every part of the United States."[19] In a variety of constitutional provisions, the Framers clearly sought to avoid sectional domination of the Government, and it might be argued that, in seeking geographical balance on the Court, a President is respecting a value implicit in our constitutional system.

Geographic balance was most clearly a presidential consideration with respect to Supreme Court appointments through the late 19th century. In selecting the original members of the Court, George Washington chose representatives of New York, Pennsylvania, Massachusetts, Virginia, and South Carolina. As the country moved westward, each President, starting with Jefferson, began to seek seats first for Justices from states west of the Alleghenies, then from west of the Mississippi, and finally, with Lincoln's appointment of Stephen J. Field of California, from the Far West. Andrew Jackson, who made seven nominations, tried scrupulously to have represented each circuit in the nation's growing judicial system. The balance of Northerners and Southerners was also of obvious political significance, both before and after the Civil War. Part of President Hayes' program of postreconstruction reconciliation was the appointment of a Southerner (although Northern-born), William Woods, to the Court in 1880. The symbolism was consummated in 1887 by President Cleveland's appointment of Lucius Q. C. Lamar, the first "real" Southerner to reach the Court since 1853, and a former member of both the Confederate Army and the government of the Confederacy.[20]

In this century, although remaining of some concern, the emphasis on regionalism has been less obvious. Some Presidents have more or less disavowed its importance. Theodore Roosevelt wrote, "I have grown to feel, most emphatically, that the Supreme Court is a matter of too great importance to me to pay heed to where a man comes from."[21]

[19] Padover at 405.
[20] Abraham at 131.
[21] Abraham at 146.

Roosevelt appointed, within a 4-year period, two Justices from Massachusetts, Oliver Wendell Holmes and William H. Moody. A similar "imbalance" occurred under Presidents Coolidge and Hoover, who appointed three New York Justices—Chief Justice Hughes and Associate Justices Stone and Cardozo. This imbalance, lasting 8 years, occurred notwithstanding Hoover's reluctance, before picking Cardozo, to choose another New Yorker for the Court.

The Supreme Court currently includes two Minnesotans (both appointed by Nixon), and one Justice each from New Jersey, Ohio, Colorado, Maryland,[22] Virginia, Arizona, and Illinois. The most recent New Englander to serve on the Court was Chief Justice Stone, who died in 1946. The most recent representative of the Deep South was Hugo Black, who died in 1971, although in selecting Justice Powell to succeed Black, President Nixon emphasized Powell's southern origins.

Although not explicitly contemplated during the constitutional debates, Presidents, for political reasons or otherwise, have also sought "balance" with respect to other criteria as well: partisan affiliation, religion, and, most recently, race. There continue to be strong pressures to appoint a woman Justice.

It is arguable that such considerations as race, religion, ethnicity, or sex are offensive criteria in the choice of Justices, because they distract from the idea of simply choosing the "best" persons for the Court or from the constitutional grant of total discretion to the nominating President. It is also arguable, however, that diversity on the Court boosts public confidence in the legitimacy of the Court's decisions. In addition, presidential concerns for diversity may properly affirm egalitarian ideals in the society at large and the value of diversity itself.

As the record now stands, of the 101 people to serve on the Court, all have been men, 100 have been white, 95 have been of Anglo-Saxon descent, 95 have been native-born, and almost all have been Protestant.[23] Roger Taney, a Catholic and the first non-Protestant appointed, served from 1836 to 1864. Thereafter, one seat on the Court was held by a Catholic from 1894 to the present, except for a 7-year period between 1949 and 1956.[24] Louis Brandeis, the first Jewish Justice, was appointed in 1916. At least one seat on the Court between 1916 and 1969 was held by a Justice who was Jewish.[25] Thus, except for a pattern of regional diversity, the history of the Court reveals a largely homogeneous membership when measured according to the most obvious criteria of social background.

---

[22] Though appointed from New York, Justice Marshall was born and started his legal career in Baltimore. Ashby at 320–26.

[23] Abraham at 53.

[24] This group includes Justices E. D. White, McKenna, Butler, Murphy, and Brennan. Abraham at 56–57.

[25] This group includes Justices Cardozo, Frankfurter, and Goldberg. Abraham at 58.

### *D. Other Criteria*

Ability, character, and philosophical or representative suitability hardly exhaust the list of criteria evident in the nominations made to the Court thus far. Age and health, of course, have played major parts. The appointment of a younger person to the Court may help assure a new Justice's continued influence over a long period, or at least help assure the Court of the continued aid of a physically vigorous individual. In one case, perhaps, a President used old age as a criterion. William Howard Taft's appointment in 1910 of the 66-year-old Edward D. White to be Chief Justice may have been motivated, in part, by Taft's desire to assure the subsequent occurrence of a vacancy that he himself could assume after his Presidency.[26]

Other considerations in the choice of nominees may include friendship, the rewarding of political partisanship or of particular public service, the effective elimination of a political opponent, placating political opposition or securing political support. None of these alone has likely secured the position of a Supreme Court Justice; however, each has been among the motivations underlying the selection of particular nominees from pools of otherwise qualified persons.

The presence of ulterior motives in the nominating process or a close association between a nominee and the appointing President of course need not correlate with the candidate's unsuitability on other grounds. Among the justices appointed by the Presidents of whom they were close personal or political allies are Roger Taney (Jackson), Stephen Field (Lincoln), Harlan Fiske Stone (Coolidge), and Felix Frankfurter (FDR), all of whom would have qualified under any set of criteria.

However, although no clear formula exists for the selection of a great future Justice or one set formula to identify a fit nominee, the President's thinking perhaps may usefully be guided by a set of general principles. With respect to criteria closely related to a person's likely performance on the Court, some high degree of ability, character, health, and philosophical compatibility ought to be viewed as a set of threshold requirements. Having identified a pool of qualified finalists, the President could then—without undermining public confidence in his choice—consider other criteria, *e.g.*, geographic suitability, background (sex, race), or rewarding public service, that might legitimately play a part in his ultimate selection. To the extent his criteria might be considered personal or political favoritism, he should be all the more careful that his choice be defensible when measured against other candidates and against criteria related to likely performance. Though no President can guarantee greatness in his appointees, he can likely avoid serious disappointment by soliciting a variety of suggestions for any vacancy, evaluating candidates across a wide range of criteria, and, in analyzing

[26] Abraham at 159.

his personal preferences, bearing in mind the Court's needs and public perceptions of the Court.[27]

### III. Identification and Evaluation of Nominees

Because presidential acquaintance and selection criteria rarely limit the pool of eligible candidates for the Supreme Court to one, Presidents ordinarily rely to some degree on the assistance and advice of others in choosing their nominees. Analytically, such assistance may be viewed as coming in two stages: first, the identification of suitable candidates for the Court; second, the more exacting evaluation of the serious contenders.

#### *A. Identification of Potential Nominees*

Potential sources of information concerning suitable candidates are almost endless. Solicited or unsolicited suggestions may come from the President's advisers, both official and unofficial, as well as from Members of Congress, sitting members of the judiciary, legal scholars, state bar representatives, concerned private citizens and candidates themselves.

Some instances are known in which Congress played a strong role, invited or otherwise, in the candidate identification process. In perhaps the most dramatic instance, Thomas Jefferson, in his search for a Supreme Court Justice to come from west of the Appalachians, asked each Member of Congress to suggest two names. He selected Thomas Todd of Kentucky, the one person named as first or second choice by every Member of Congress from the new Seventh Circuit, which comprised Kentucky, Ohio, and Tennessee. Later in the 19th century, Congress mounted notable, though uninvited campaigns for President Lincoln's 1862 nomination of Samuel Miller[28] and for President Grant's 1869 nomination of Edwin M. Stanton.[29] Although these are exceptional examples of congressional activism, suggestions by individual Members of Congress, particularly from the leadership, are undoubtedly common.

Suggestions from sitting judges or Justices may also be expected. Indeed, in one case, the entire incumbent Supreme Court wrote to the President to urge the nomination of a particular candidate: John Campbell of Alabama, who was nominated for the Court in 1853 by Presi-

[27] A President should also be aware of the extent to which an appointment may, as a matter of political fact, "change the law." There are issues, such as federalism, affirmative action, the death penalty, abortion rights, and school desegregation, on which lawyers and political scientists perceive the current Court in flux. The balance of Court opinion on issues in these areas may be affected by a new Justice, although Presidents typically have not been successful in making new law through individual appointments. This is attributable not only to the unpredictability of an individual's views and behavior, discussed above, but also to the Justices' ordinary adherence to precedent, by which most Justices consider themselves guided, if not bound.

[28] Schubert at 41–44.

[29] Abraham at 118.

dent Pierce.[30] Chief Justices may more routinely offer their views on nominations. The most active campaigner among Chief Justices was likely William Howard Taft. Taft had appointed six men to the Court during his tenure as President, and appears to have been principally responsible for selecting three nominees, including himself as Chief Justice, for President Harding.[31] More recently, Chief Justice Burger is known at least to have supported the nominations of Associate Justices Blackmun and Powell.[32]

Where Presidents have turned to Cabinet officers for advice, it is common for the Attorney General to play a major role both in suggesting and in evaluating nominees. George Washington initiated the practice by asking Edmond Randolph to prepare a list of candidates for the bench.[33] In recent decades, Attorneys General Cummings and Biddle (for FDR), Brownell (for Eisenhower), Robert Kennedy (for John Kennedy), Mitchell (for Nixon), and Levi (for Ford) all performed significant "screening" functions during the nominations process. However, just as no legal provision limits presidential criteria for candidate selection, there are no formal limitations or requirements binding the President to any particular system of identifying Supreme Court candidates.[34]

### *B. Evaluation of Nominees (Herein, the Roles of the Department of Justice and of the American Bar Association)*

Whoever is responsible for identifying plausible candidates, the function remains of evaluating the serious contenders according to the President's criteria. In 1789, when the Judiciary Act established a federal bench comprising 19 judges, the evaluation process could rely with some success on the personal knowledge of the President and of his close advisers. Even for a nine-member Supreme Court, however, this is no longer a wholly satisfactory option. The far greater pool of available talent today and the intensity of public scrutiny to which nominees are currently subjected make it desirable to follow a more rigorous and dependable information-gathering process.

A tradition is now well established of active Attorney General and Department of Justice participation in the process of evaluating Supreme Court nominees. The exact pattern of participation has varied with different Presidents. The Attorney General, with whatever De-

---

[30] Abraham at 104.

[31] Abraham at 21, 155.

[32] Woodward and Armstrong at 87, 160.

[33] Rogers at 38.

[34] For a time, in the early 19th century, the Department of State was assigned the function of offering the President recommendations concerning all appointments. Even after Attorney General Cushing in 1853 reassumed the assignment for his office with respect to judicial appointments, Attorney General Bates, under Lincoln, was still able to complain that the Secretary of the Treasury had been instrumental in making many appointments "without any reference to legal and judicial qualifications." Rogers at 39.

partment assistance he seeks, may initiate a study of potential nominees. The Department also plays a special role in marshalling the recommendations of private groups and individuals, most notably—since the Eisenhower Administration—of the American Bar Association (ABA) Standing Committee on Federal Judiciary (the ABA Committee).

The practice of soliciting formal ABA views on Supreme Court nominations began with President Eisenhower's 1956 nomination of Judge William J. Brennan, Jr. to replace Justice Minton. The President had assigned to Attorney General Brownell and the Department of Justice the task of recommending a nominee to meet four specific criteria: an exemplary personal and professional reputation for legal and community leadership; good health; relative youth; and ABA "recognition." He also expressed a preference for giving most serious consideration to the promotion of an outstanding lower court judge.[35] Brownell, to whom Judge Brennan was strongly recommended by New Jersey's Chief Justice Vanderbilt, the New Jersey Bar Association, the American Judicature Society, and a host of other organizations,[36] submitted Brennan's name to the Federal Bureau of Investigation for a full-field investigation and to the ABA Committee for its assessment of professional qualifications. The results of the ABA and FBI investigations were presented to the Attorney General for his consideration and eventual review with the President.[37]

FBI full-field checks on proposed nominees are routine. Since the Brennan appointment, however, the mode of ABA input has varied from nomination to nomination. Through the Johnson Administration, it was typical practice to afford the ABA a very brief investigation period prior to the announcement of a nomination. The resulting time pressure apparently made it difficult for the ABA to rely successfully, in its view, on any precise system of ranking nominees. For example, with Justice Goldberg's nomination in 1962, the Committee decided to abandon any statement seeming to rank or quantify the nominee's suitability, and instead offered the statement that the nominee was "highly acceptable from the point of view of professional qualifications." [38]

For undisclosed reasons, President Nixon abandoned the practice of consulting the ABA prior to announcing his nominees, a decision that, with respect to the President's attempts to find a successor to Justice Fortas, seemingly contributed to controversial results both for the President and for the ABA. The ABA Committee, like the general public, learned of the Nixon nominations only from the President's announcements. With the invitation of the Senate Judiciary Committee,

---

[35] Rogers at 39–40; Abraham at 235.
[36] Abraham at 245.
[37] Rogers at 40.
[38] Walsh at 556.

the ABA Committee first reviewed the qualifications of Judge Clement F. Haynsworth, Jr., the first Nixon nominee to the Fortas seat. The Committee unanimously found Haynsworth "highly qualified" for the post, a conclusion that it later ratified only 8–4 after public disclosures during the confirmation process indicated possible insensitivity on Judge Haynsworth's part to financial conflicts of interest.

When the Senate defeated the Haynsworth nomination, President Nixon, acting again on the recommendation of Attorney General Mitchell, nominated Judge G. Harrold Carswell, a former U.S. district judge in the Northern District of Florida who had recently been appointed to the U.S. Court of Appeals for the Fifth Circuit. Mitchell was reported to have said of Carswell, "He is almost too good to be true." [39] Sensitized by the Haynsworth debate and apparently hoping to avoid dissent on the degree of a nominee's suitability, the ABA Committee, in assessing Carswell's background, reverted to a "qualified"/"not qualified" system of evaluation, and reported Carswell "qualified." When Carswell, during the confirmation process, was attacked for mediocre judicial talent and hostility to civil rights, and ultimately defeated, the prestige of the ABA also suffered, although ABA Committee Chairman Lawrence E. Walsh defended the Committee's assessment in light of its investigation into Carswell's performance on the Fifth Circuit.[40]

President Nixon again did not consult the ABA Committee before announcing his third nominee to the Fortas seat, Judge Harry A. Blackmun of the U.S. Court of Appeals for the Eighth Circuit. Chief Justice Burger supported Blackmun's nomination, and the candidate was interviewed by Attorney General Mitchell and the Assistant Attorneys General in charge of the Office of Legal Counsel and the Tax Division.[41] The ABA Committee again conducted a post-announcement evaluation. It adopted a "not qualified"/"not opposed"/"meets high standards of integrity, judicial temperament, and professional competence" system of ranking, seeking to avoid the appearance of a plenary endorsement for a merely acceptable candidate and emphasizing the assertedly nonideological character of its endorsement for a highly qualified candidate.[42] The ABA Committee turned in its most extensive report ever on a Supreme Court nominee for Judge Blackmun, finding that he met "high standards of integrity, judicial temperament, and professional competence." [43] The Senate unanimously confirmed the Blackmun nomination on May 12, 1970.

These events, however, did not conclude the Nixon Administration's history of difficulties with the ABA. In September, 1971, Justices Black

[39] Abraham at 6.
[40] Walsh at 556–57.
[41] Woodward and Armstrong at 86.
[42] Walsh at 560.
[43] Walsh at 560.

and Harlan resigned, leaving the President the task of replacing two of the Court's most highly esteemed members. Attorney General Mitchell had written in July, 1970, to ABA Committee Chairman Walsh that the Administration would henceforth submit lists of Supreme Court candidates to the Committee for its evaluation prior to nomination, an announcement that won high acclaim in light of the ABA's rigorous work on the Blackmun nomination.[44] The President's first suggested candidate was Rep. Richard H. Poff of Virginia, who received the Committee's highest recommendation, but the President withdrew his name from consideration when the press reported his past anti-civil rights statements.

The Administration's next submission was a list of six names, including California Court of Appeals Judge Mildred Lillie, Arkansas municipal bond lawyer Herschel H. Friday, D.C. Superior Court Judge Sylvia Bacon, Sen. Robert C. Byrd of West Virginia, and Judges Charles Clark and Paul H. Roney of the U.S. Court of Appeals for the Fifth Circuit. The first two were the President's top choices—Mr. Friday was a close friend of Attorney General Mitchell and had been recommended by Chief Justice Burger and Justice Blackmun—and the Committee devoted almost all its investigative work to them.[45] The Attorney General had recommended the submission of their names notwithstanding reservations expressed by White House Counsel John Dean and Assistant Attorney General Rehnquist concerning their judicial experience and lack of constitutional law background.[46] The results were a unanimous vote of "not qualified" for Judge Lillie and a 6–6 tie between "not qualified" and "not opposed" for Mr. Friday. News of the ABA actions reached the press within hours of its report to the Attorney General; the ABA urged the President to "add some people with stature" to his list.[47] The Administration informed the ABA in a letter from the Attorney General to Chairman Walsh that it could no longer rely on the confidentiality of the Committee, and would return to its practice of submitting nominations directly to the Senate.[48]

According to two commentators, Attorney General Mitchell acted prior to the ABA Committee's formal vote to solicit the acceptance by another candidate, former ABA president Lewis F. Powell, Jr., of his nomination to the Black seat.[49] Mitchell and Deputy Attorney General Kleindienst recommended to the President his eventual nominee for the Harlan seat, Assistant Attorney General Rehnquist.[50] Subsequent to the

---

[44] Abraham at 28.
[45] Abraham at 10, 29.
[46] Woodward and Armstrong at 159.
[47] Abraham at 10.
[48] Abraham at 30.
[49] Woodward and Armstrong at 160.
[50] Woodward and Armstrong at 161.

President's announcement of his choices, the ABA Committee voted unanimously that Powell met "high standards of integrity, judicial temperament, and professional competence." Eight members of the Committee voted the same endorsement of Rehnquist, with four voting "not opposed." Powell was confirmed by the Senate almost immediately, and Rehnquist, within several weeks.

In contrast to this stormy history, the Department of Justice and the ABA enjoyed a smooth relationship during the process of evaluating candidates in 1975 to succeed Justice William O. Douglas. President Ford and Attorney General Levi returned to the practice of submitting names to the Committee for its evaluation prior to nomination. On the day of Douglas' retirement, Levi submitted a list of candidates to the ABA Committee.[51] The Committee unanimously gave Levi's first choice, Judge John Paul Stevens of Chicago, its highest rating. Judge Stevens was subsequently nominated and confirmed without difficulty.

These events underscore significant questions of how best to make use of the assistance and resources of private parties in the evaluation of Supreme Court candidates and, at the same time, maintain the full scope of presidential discretion that the Constitution provides for the nomination of Supreme Court Justices. ABA assistance can undoubtedly be helpful in the evaluation of Supreme Court candidates, although how best to accomplish its role has itself been a subject of long debate by the ABA Committee. The Committee describes its function as limited to an examination of "professional competence, judicial temperament, and integrity," [52] about which it is undoubtedly able to express an educated point of view. As time permits, the Committee's investigation includes interviews with judges, scholars, lawyers, public officials, and other parties likely to have information regarding a nominee's qualifications, plus a review of the nominee's writings by teams of law school professors and practicing lawyers. The ABA Committee's conclusions based on this kind of thorough study may be a useful guide to the President or his advisers in applying the President's criteria during the nomination process.

However, extensive ABA input, especially before nomination, may lead to criticism that an organization that is not responsible to any public political process is exercising undue influence in the presidential selection of nominees.[53] The ABA Committee currently comprises 14 members—one member at-large and one practicing lawyer from each of the geographic areas covered by the 11 judicial circuits, except for the Fifth and Ninth, which areas—because of their size—have two members each. There can be no assurance, however, that it fully represents the American public, or even the American bar, given that nearly half

[51] American Bar Association at 2.
[52] American Bar Association at 2.
[53] Abraham at 23; Grossman at 212-15; Murphy and Pritchett at 76-77; Schmidhauser at 28-33.

the lawyers in the United States do not belong to the ABA. Neither is there any government control over the exhaustiveness of its survey or the objectivity of its evaluation. Though consultation with the ABA prior to nomination may confer advantages in the evaluation process, it may risk the public's perception that the selection process for the least politically accountable branch of government is itself being removed a step from public accountability.[54]

What is not open to question is that, whatever sources are consulted prior to nomination, the pre-nomination investigation of any nominee should be deep, broad, and disinterested enough to assure an informed evaluation of the nominee's professional qualifications, temperament, health, and integrity. So long as the goals of the investigative process and the advisory roles of the participants are clearly defined, it should be possible to avoid the difficulties encountered during the Nixon nominations and make the best possible use of information from all sources.

## IV. The Confirmation Process

Once the processes of candidate evaluation produce a nominee, the President submits his choice for the "advice and consent" of the Senate. For the first half of this century, it appeared that the Senate's role in materially influencing the selection of a Justice had ended; its confirmation of presidential nominees was virtually automatic.[55] Though equal participation by the Senate and the President in choosing Justices may be gone, however, the Senate has significantly reasserted its hand in the selection of Justices since 1968. Since the conditional resignation of Earl Warren from the Chief Justiceship, four presidential nominations for the Chief or an Associate Justiceship have been withdrawn or were defeated at least in part because of Senate action.[56]

The Senate's procedure following nomination is straightforward. Except in the cases of two ex-Senators, the Senate has always referred Supreme Court nominations to the Senate Judiciary Committee. Since

[54] It has been debated since 1973 whether the reporting and other "sunshine" provisions of the Federal Advisory Committee Act, 5 U.S.C. App. § 10, apply to the ABA Committee in its role of advising this Department. The Office of Legal Counsel concluded in 1973 that the Act does cover the ABA Committee, although the practical effects of such coverage on the operation of the Committee would be limited. This position was affirmed in a February, 1974, letter from Attorney General Saxbe to the ABA Committee. After further correspondence, Attorney General Saxbe informed the Committee in October, 1974, that OLC, under then Assistant Attorney General Scalia, had reexamined the issue and found that the Act did not cover the ABA Committee.

[55] Prior to 1968, the Senate failed only once in this century to confirm a presidential nomination to the Supreme Court: President Hoover's 1930 nomination of Judge John J. Parker to be an Associate Justice. Swindler at 536.

[56] Justice Fortas withdrew his nomination for the Chief Justiceship in October, 1968, after the Senate failed to end a filibuster preventing a vote on his elevation. His action eliminated the prospective vacancy to which President Johnson had nominated Judge Homer Thornberry of the Fifth Circuit. In 1969, the Senate defeated President Nixon's first nominee to succeed Justice Fortas, Judge Clement F. Haynsworth, Jr. In 1970, it defeated his second nominee, Judge G. Harrold Carswell. Abraham at 266; Swindler at 536.

President Coolidge's nomination in 1925 of Harlan Fiske Stone to an Associate Justiceship, the committee has usually interviewed the nominee in person.[57] It is modern practice, since President Roosevelt's 1938 nomination of Stanley Reed, for the committee to hold public hearings on the nomination.[58] If the committee recommends approval, as it invariably has in recent decades, the nomination is sent to the floor for debate and an eventual vote by the entire Senate. Confirmation requires a majority vote.

The factors that may affect the results of a Senate confirmation vote are innumerable; long and complex explanations have been written concerning the politics of the confirmation process. Although the history is fascinating, this memo will only briefly consider the politics of confirmation to underline the one relevant and perhaps obvious point that Senators' opposition to a candidate may not relate in any way to the President's criteria for choosing a suitable candidate for the Court. This is understandable because Senators may well decide their votes based on partisanship, individual animosity, opposition to a nomination by constituent or special interest groups, ideological differences, or intraparty politics.[59]

One commentator has usefully divided the reasons for Senate opposition to a candidate into three categories: reasons related to the character, ability, or integrity of the candidate; reasons related to partisanship or the candidate's ideology; and reasons related to a candidate's prior identification with the unpopular side of a significant political controversy.[60] The stronger the opposition to a candidate, the more likely the nominee is to face detractors on all of these grounds.

Relatively few nominees have been credibly opposed on grounds of outright inability. Perhaps the nominee to fare worst in this respect was George H. Williams, an undistinguished lawyer nominated unsuccessfully by President Grant in 1873. Most recently, Judge Carswell was opposed in part because of alleged lack of ability, although it would be difficult to determine the relative importance to his defeat of the Senate's evaluation of his judicial performance and its reaction to his record of apparent insensitivity to civil rights.

Opposition on ethical grounds was a factor in the defeat of both the nomination of Justice Fortas to be Chief Justice and the nomination of Judge Haynsworth to succeed Justice Fortas. The filibuster against

[57] Stone's nomination was controversial chiefly because, having succeeded a Harding appointee, Harry M. Daugherty, as Attorney General, he refused to drop a Department of Justice case brought by Daugherty, a figure in the Teapot Dome scandal, against Senator Wheeler of Montana. Frank at 491.

[58] The Judiciary Committee decided to end its practice of conducting its nomination debates entirely in executive session after the controversy engendered by public revelation of the past Ku Klux Klan membership of Justice Hugo Black, whose nomination it had approved by a vote of 13–4 in 1937. Abraham at 201; Ashby at 53.

[59] *See generally* Goff; Swindler.

[60] Ashby at 29–31.

Fortas may have succeeded chiefly because of opposition to his judicial philosophy and opposition to President Johnson as a lameduck President in 1968. However, Fortas was also opposed for accepting paid employment by American University while on the Court and for maintaining a close advisory relationship with President Johnson, which seemed to some an inappropriate breach of separation of powers.[61] When Fortas later resigned under charges of ethical insensitivity (he had received and returned, while on the Court, fees from investor Louis Wolfson and the Wolfson family's foundation), President Nixon's first designated successor, Judge Haynsworth, faced opposition based on his participation in lower court cases in which he arguably had or created a financial conflict of interest.[62]

Considerations of personal or judicial ideology were clearly grounds for Senate opposition to the nominations of Justice Fortas and Judges Haynsworth and Carswell. Senators opposed Fortas' liberal stands on desegregation, criminal procedure, and free speech. Civil rights and labor groups attacked the allegedly hostile positions of Judge Haynsworth. Judge Carswell's opponents emphasized his statement in support of "the principles of White Supremacy" during his 1948 campaign for the Georgia legislature.[63]

Partisan opposition, whether or not "ideological," may also defeat a candidate. Of the 14 presidents whose nominees were rejected or otherwise "killed" by the Senate, six—John Quincy Adams, Tyler, Polk, Fillmore, Buchanan, and Andrew Johnson—held office in the face of overwhelming congressional opposition. At the times they lost their respective nomination fights, it is doubtful that they could have secured the nomination of almost any individual to the Court.

Interestingly, the most "venerable" ground historically for Senate opposition to a nominee is the nominee's prior identification with the losing side in a national controversy. The first rejected nomination was that of John Rutledge for Chief Justice in 1795, based largely on his attack on the Jay Treaty, which the Federalists vigorously supported. No one-issue debate has loomed as large in the defeat of any Supreme Court nominee in this century.

The role of the Attorney General and the Department of Justice in the appointment process has generally been to identify and evaluate candidates according to the President's criteria. Department of Justice witnesses, however, have occasionally played a role in confirmation hearings either to elaborate on the Administration's evaluation of a

[61] Ashby at 338–41.

[62] Abraham at 4–5; Ashby, at 387–88.

[63] Ideological opposition to a candidate may, of course, backfire. The overall career record on civil rights and labor issues of Fourth Circuit Judge John J. Parker, whose Supreme Court nomination was defeated in 1930, was undoubtedly more progressive or liberal then the Supreme Court voting record of President Hoover's subsequent successful nominee, Owen J. Roberts, although Parker's nomination was defeated primarily through the pressure of labor and civil rights groups. Schubert at 49–50.

nominee's record or to comment on legal issues raised by a particular appointment. Not including former Assistant Attorney General Rehnquist's testimony at his own confirmation hearing, Department of Justice Representatives have testified with respect to only two of the nine persons nominated to the Supreme Court since 1968. Attorney General Levi testified in support of the 1975 nomination of Judge John Paul Stevens. *Nomination of John Paul Stevens to be a Justice of the Supreme Court: Hearings Before the Senate Comm. on the Judiciary,* 94th Cong., 1st Sess. 3 (1975). During the hearings on Justice Fortas' nomination to the Chief Justiceship, Attorney General Clark testified regarding whether Chief Justice Warren's conditional resignation legally created a vacancy on the Court, *Nominations of Abe Fortas and Homer Thornberry: Hearings Before the Senate Comm. on the Judiciary,* 90th Cong., 2d Sess. 8 (1968), and Deputy Attorney General Warren Christopher testified regarding a memorandum he had prepared at the request of committee member Senator Hart concerning the meaning and impact of the Supreme Court opinions of Justice Fortas. *Id.,* at 315.[64]

## V. Conclusion: The Appointment Process and Post-Appointment Performance

Unsurprisingly, the measures of success on the Court vary as widely as the criteria for selection.[65] In considering what process of candidate selection is most likely to yield a successful Justice, it must first be borne in mind that, like other virtues, judicial excellence is significantly in the eye of the beholder, varying with time and place.

If a President's measure of success is the predictability of his appointee's decisions, no selection process can guarantee a happy result. Even a President's intimate familiarity with the opinions of a nominee cannot assure that their views will coincide as the appointed Justice grows in his position and faces novel questions unforeseen at the time of his appointment. There are notable examples of presidential dissatisfaction with the performance of an appointee, *e.g.,* Madison, with the Federalist Story; Teddy Roosevelt, with Holmes' vote in the Northern

---

[64] A Department of Justice Attorney, Norman Knopf, testified under subpoena in a private capacity during the hearings on Judge Carswell concerning his experiences with Judge Carswell while a member of the Law Students Civil Rights Research Council, prior to his employment with the Department of Justice. *George Harrold Carswell: Hearings Before the Senate Comm. on the Judiciary,* 91st Cong., 2d Sess. 174 (1970).

[65] Two commentators have written that success on the Court is:

> the result of several qualities in combination: scholarship; legal learning and analytical powers; craftsmanship and technique; wide general knowledge and learning; character, moral integrity and impartiality; diligence and industry; the ability to express oneself with clarity, logic and compelling force; openness to change; courage to take unpopular positions; dedication to the Court as an institution and to the office of Supreme Court Justice; ability to carry a proportionate share of the Court's responsibility in opinion writing; and finally, the quality of statesmanship.

Dennis, *Overcoming Occupational Heredity at the Supreme Court,* 66 A.B.A. J. 41, 43 (1980) (quoting A. Blaustein and R. Mersky, *The First One Hundred Justices: Statistical Studies of the Supreme Court of the United States* (1978)).

Securities case; Wilson, with the conservative McReynolds; and Eisenhower, with Warren.[66]

It is likely that those Presidents who measured success more by the craftsmanship of their appointees were better pleased than those counting on predictable votes. The average Justice has been one who has reliably made substantial contributions to acceptable adjudications of difficult issues over a significant period of time. Not every Justice, of course, possesses the creativity, intellect, political acumen, and perhaps longevity, to achieve not only excellence, but "greatness." However, those candidates with the potential to be truly exceptional and extraordinary rarely stand out clearly from the pool of excellent candidates, and a process seeking to identify the "potentially great" might prove more whimsical than practical. While the eminence of John Marshall or Brandeis was perhaps predictable, no prognosticator could confidently have predicted the careers of Harlan Fiske Stone, Hugo Black, or Earl Warren. Whether a process aimed at finding "great" future jurists would have focused on them originally cannot be known.

History gives much reason for optimism that, whatever the President's criteria, a potentially successful member of the Court meeting those criteria can be found with proper care. A clear set of standards, input from numerous sources, a broad-based search for candidates, and time enough for a thorough evaluation are the elements necessary and sufficient to find the appropriate nominee.

## APPENDIX

## DATA ON SUPREME COURT APPOINTMENTS

1. Succession of the Justices of the Supreme Court of the United States
2. Supreme Court Nominations Rejected or Refused
3. Prior Judicial Experience of U.S. Supreme Court Justices and Their Subsequent Service
4. Occupations of Supreme Court Designees at Time of Appointment
5. Acknowledged Religion of the 100 Individual Justices of the Supreme Court (at time of appointment)
6. The 31 States From Which the 103 Supreme Court Appointments Were Made
7. Occupational Backgrounds of Supreme Court Nominees Since 1937

[66] Abraham at 62–63.

## Table 1

**TABLE OF SUCCESSION OF THE JUSTICES OF THE SUPREME COURT OF THE UNITED STATES**
Showing Years of Active Service on the Court

Judiciary Act of 1789 provided for a Chief Justice and 5 Associate Justices

| Years | | | | | | |
|---|---|---|---|---|---|---|
| 1789–1790 | John Jay 1789-1795 | John Rutledge 1789-1791 | William Cushing 1789-1810 | James Iredell 1790-1799 | James Wilson 1789-1798 | John Blair 1789-1796 |
| 1790–1800 | John Rutledge 1795<br>Oliver Ellsworth 1796-1799 | Thomas Johnson 1791-1793<br>William Paterson 1793-1806 | | Alfred Moore 1799-1804 | Bushrod Washington 1798-1829 | Samuel Chase 1796-1811 |
| 1800–1810 | John Marshall 1801-1835 | Henry B. Livingston 1806-1823 | | William Johnson 1804-1834 | | |
| 1810–1820 | | | Joseph Story 1811-1845 | | | Gabriel Duval 1811-1836 |
| 1820–1830 | | Smith Thompson 1823-1843 | | | Henry Baldwin 1830-1844 | |
| 1830–1840 | Roger B. Taney 1836-1864 | | | James M. Wayne 1835-1867 | | Philip P. Barbour 1836-1841 |
| 1840–1850 | | Samuel Nelson 1845-1872 | Levi Woodbury 1846-1851 | | Robert C. Grier 1846-1870 | Peter V. Daniel 1841-1860 |
| 1850–1860 | | | Benjamin R. Curtis 1851-1857<br>Nathan Clifford 1858-1881 | | | |
| 1860–1870 | Salmon P. Chase 1864-1873 | | | Act of July 23, 1866, provided for reduction of the Court to 7 members as vacancies should occur | William Strong 1870-1880 | Samuel F. Miller 1862-1890 |
| 1870–1880 | Morrison R. Waite 1874-1888 | Ward Hunt 1872-1882 | | | William B. Woods 1880-1887 | |
| 1880–1890 | Melville W. Fuller 1888-1910 | Samuel Blatchford 1882-1893 | Horace Gray 1881-1902 | | Lucius Q. C. Lamar 1888-1893 | Henry B. Brown 1890-1906 |
| 1890–1900 | | Edward D. White J 1894 CJ 1910-1921 | | | Howell E. Jackson 1893-1895<br>Rufus W. Peckham 1895-1909 | |
| 1900–1910 | | | Oliver Wendell Holmes 1902-1932 | | Horace H. Lurton 1909-1914 | William H. Moody 1906-1910 |
| 1910–1920 | Edward D. White J 1894 CJ 1910-1921 | Willis Van Devanter 1910-1937 | | | James C. McReynolds 1914-1941 | Joseph R. Lamar 1910-1916<br>Louis D. Brandeis 1916-1939 |
| 1920–1930 | William H. Taft 1921-1930 | | Benjamin N. Cardozo 1932-1938<br>Felix Frankfurter 1939-1962 | | | |
| 1930–1940 | Charles E. Hughes 1930-1941 | Hugo L. Black 1937-1971 | | | | William O. Douglas 1939 |
| 1940–1950 | Harlan F. Stone J 1925 CJ 1941-1946<br>Fred M. Vinson 1946-1953 | | | | James F. Byrnes 1941-1942<br>Wiley Rutledge 1943-1949<br>Sherman Minton 1949-1956 | |
| 1950–1960 | Earl Warren 1953-1969 | | | | William J. Brennan 1956 | |
| 1960–1970 | Warren E. Burger 1969 | | Arthur J. Goldberg 1962-1965<br>Abe Fortas 1965-1969 | | | |
| 1970–1980 | | Lewis F. Powell, Jr. 1972 | Harry A. Blackmun 1970 | | | |

*Succeeded by Justice John Paul Stevens, December 19, 1975.

From Abraham at 292-93.

February, 1972

## TABLE OF SUCCESSION OF THE JUSTICES OF THE SUPREME COURT OF THE UNITED STATES

| Years | | | | | | |
|---|---|---|---|---|---|---|
| 1789–1790 | | | | | | |
| 1790–1800 | Act of February 24, 1807, provided for increase of the Court to 7 members | | | | | |
| 1800–1810 | Thomas Todd 1807-1826 | | Act of March 3, 1837, provided for increase of the Court to 9 members | Act of March 3, 1863, provided for increase of the Court to 10 members | | Act of April 10, 1869, provided for increase of the Court to 9 members |
| 1810–1820 | | | | | Act of July 23, 1866, provided for reduction of the Court to 7 members as vacancies should occur. (Actually, the Court fell to 8.) | |
| 1820–1830 | Robert Trimble 1826-1828; John McLean 1829-1861 | | | | | |
| 1830–1840 | | John Catron 1837-1865 | John McKinley 1837-1852 | | | |
| 1840–1850 | | | | | | |
| 1850–1860 | | Act of July 23, 1866, provided for reduction of the Court to 7 members as vacancies should occur | John A. Campbell 1853-1861 | | | |
| 1860–1870 | Noah H. Swayne 1862-1881 | | David Davis 1862-1877 | Stephen J. Field 1863-1897 | | |
| 1870–1880 | | | John M. Harlan 1877-1911 | | | Joseph P. Bradley 1870-1892 |
| 1880–1890 | Stanley Matthews 1881-1889; David J. Brewer 1889-1910 | | | | | |
| 1890–1900 | | | | Joseph McKenna 1898-1925 | | George Shiras, Jr 1892-1903 |
| 1900–1910 | | | | | | William R. Day 1903-1922 |
| 1910–1920 | Charles E. Hughes 1910-1916; John H. Clarke 1916-1922 | | Mahlon Pitney 1912-1922 | | | |
| 1920–1930 | George Sutherland 1922-1938 | | Edward T. Sanford 1923-1930 | Harlan F. Stone J 1925 CJ 1941-1946 | | Pierce Butler 1922-1939 |
| 1930–1940 | Stanley F. Reed 1938-1957 | | Owen J. Roberts 1930-1945 | | | |
| 1940–1950 | | | Harold H. Burton 1945-1958 | Robert H. Jackson 1941-1954 | | Frank Murphy 1940-1949; Tom C. Clark 1949-1967 |
| 1950–1960 | Charles E. Whittaker 1957-1962 | | Potter Stewart 1959 | John M. Harlan 1955-1971 | | |
| 1960–1970 | Byron R. White 1962 | | | | | Thurgood Marshall 1967 |
| 1970–1980 | | | | Wm. H. Rehnquist 1972 | | |

## TABLE 2.—SUPREME COURT NOMINATIONS REJECTED OR REFUSED

[In the following tabulation, details on the nominations to the Supreme Court of the United States which were declined by the nominees or acted on adversely by the Senate have been summarized. The political composition of the Senate at the time of such action is shown by major parties only: F.—Federalist; A.-F.—Anti-Federalist; D.R.—Democratic Republican; N.R.—National Republican; W.—Whig; D.—Democratic; R.—Republican.]

| President and Supreme Court nominee | Senate composition | Date of nomination | Action on nomination | Nature of action |
|---|---|---|---|---|
| George Washington | | | | |
| Robert H. Harrison | F. 17; A.-F. 9 | Sept. 24, 1789 | Sept. 26, 1789 | Confirmed; declined. |
| William Paterson[1] | F. 17; A.-F. 13 | Feb. 27, 1793 | Feb. 23, 1793 | Withdrawn. |
| John Rutledge, C.J.[2] | F. 19; A.-F. 13 | July 1, 1795 Nov. 5, 1795 | Dec. 15, 1795 | Rejected, 10-14. |
| William Cushing, C.J. | F. 19; A.-F. 13 | Jan. 26, 1796 | Jan. 27, 1796 | Confirmed; declined. |
| John Adams | | | | |
| John Jay, C.J. | F. 19; D.R. 13 | Dec. 18, 1800 | Dec. 19, 1800 | Confirmed; declined. |
| James Madison | | | | |
| Levi Lincoln | D.R. 28; F. 6 | Jan. 2, 1811 | Jan. 13, 1811 | Confirmed; declined. |
| Alexander Wolcott | D.R. 28; F. 6 | Feb. 4, 1811 | Feb. 13, 1811 | Rejected, 9-24. |
| John Q. Adams | D.R. 28; F. 6 | Feb. 21, 1811 | Feb. 22, 1811 | Confirmed; declined. |
| John Q. Adams | | | | |
| John J. Crittenden | D.R. 28; N.R. 20 | Dec. 17, 1828 | Feb. 12, 1829 | "Postponed." |
| Andrew Jackson | | | | |
| Roger B. Taney[3] | D. 20; W. 20 | Jan. 15, 1835 | Mar. 3, 1835 | "Postponed," 24-21. |
| William Smith | D. 30; W. 18 | Mar. 3, 1837 | Mar. 8, 1837 | Confirmed; declined. |
| John Tyler | | | | |
| John C. Spencer | W. 28; D. 25 | Jan. 9, 1844 | Jan. 31, 1844 | Rejected, 21-26. |
| Reuben H. Walworth | W. 28; D. 25 | Mar. 13, 1844 | Jan. 15, 1845 Jan. 27, 1845 | "Postponed." Withdrawn. |
| Edward King | W. 28; D. 25 | June 5, 1844 Dec. 4, 1844 | Jan. 15, 1845 Feb. 7, 1845 | "Postponed." Withdrawn. |
| John M. Read | W. 28; D. 25 | Feb. 7, 1845 | | No action. |
| James K. Polk | | | | |
| George W. Woodward | D. 31; W. 25 | Dec. 23, 1845 | Jan. 22, 1846 | Rejected, 20-29. |
| Millard Fillmore | | | | |
| Edward A. Bradford | D. 35; W. 24 | Aug. 16, 1852 | | No action. |
| George E. Badger | D. 35; W. 24 | Jan. 10, 1853 | Feb. 11, 1853 | "Postponed." |
| William C. Micou | D. 35; W. 24 | Feb. 24, 1853 | | No action. |
| James Buchanan | | | | |
| Jeremiah S. Black | D. 36; R. 26 | Feb. 5, 1861 | Feb. 21, 1861 | Rejected, 25-26. |
| Andrew Johnson | | | | |
| Henry Stanbery | R. 36; D. 26 | Apr. 16, 1866 | | No action. |
| Ulysses S. Grant | | | | |
| Ebenezer R. Hoar | R. 56; D. 11 | Dec. 15, 1869 | Feb. 3, 1870 | Rejected, 46-11. |
| Edwin M. Stanton | R. 56; D. 11 | Dec. 20, 1869 | Dec. 20, 1869 | Confirmed (d. Dec. 24, 1869). |
| George H. Williams, C.J. | R. 49; D. 19 | Dec. 1, 1873 | Jan. 8, 1874 | Withdrawn. |
| Caleb Cushing, C.J. | R. 49; D. 19 | Jan. 10, 1874 | Jan. 13, 1874 | Withdrawn. |
| Rutherford B. Hayes | | | | |
| Stanley Matthews[4] | D. 42; R. 33 | Jan. 26, 1881 | | No action. |
| Chester A. Arthur | | | | |
| Roscoe Conkling | R. 37; D. 37 | Feb. 24, 1882 | Mar. 2, 1882 | Confirmed; declined. |
| Grover Cleveland | | | | |
| William B. Hornblower | D. 44; R. 38 | Sept. 17, 1893 | Jan. 15, 1894 | Rejected, 24-30. |
| Wheeler H. Peckham | D. 44; R. 38 | Jan. 22, 1893 | Feb. 16, 1894 | Rejected, 32-41. |
| Herbert Hoover | | | | |
| John J. Parker | R. 56; D. 39 | Mar. 21, 1930 | May 5, 1930 | Rejected, 39-41. |

## TABLE 2.—SUPREME COURT NOMINATIONS REJECTED OR REFUSED—Continued

[In the following tabulation, details on the nominations to the Supreme Court of the United States which were declined by the nominees or acted on adversely by the Senate have been summarized. The political composition of the Senate at the time of such action is shown by major parties only: F.—Federalist; A.-F.—Anti-Federalist; D.R.—Democratic Republican; N.R.—National Republican; W.—Whig; D.—Democratic; R.—Republican.]

| President and Supreme Court nominee | Senate composition | Date of nomination | Action on nomination | Nature of action |
|---|---|---|---|---|
| Lyndon B. Johnson | | | | |
| Abe Fortas, C.J. | D. 64; R. 36 | June 27, 1968 | Oct. 7, 1968 | Withdrawn. |
| Homer Thornberry[5] | D. 64; R. 36 | June 27, 1968 | Oct. 7, 1968 | Withdrawn. |
| Richard M. Nixon | | | | |
| Clement F. Haynsworth, Jr. | D. 58; R. 42 | Sept. 4, 1969 | Nov. 21, 1969 | Rejected, 45-55. |
| G. Harrold Carswell | D. 58; R. 42 | Jan. 19, 1970 | April 7, 1970 | Rejected, 45-51. |

[1] Paterson's name was inadvertently submitted before his term as Senator had expired, he having been a member of the Senate which created the Court positions under the Judiciary Act of 1789, 1 Stat. 73.

[2] Rutledge was commissioned, sworn in and presided over the August, 1795, Term of the Court.

[3] The Senate rejected the nomination as an attempt to control the Court through Taney's Cabinet affiliation. In the 1836 election, with six additional states voting, the Democrats won control of the Senate. Taney was renominated, this time for Chief Justice, and was confirmed, 29-15.

[4] The nomination, caught between Democratic control of the Senate and Senator Conkling's fight with Hayes, was pigeonholed. In the new Senate, Democrats and Republicans were evenly divided. Garfield promptly resubmitted Matthews' name, and he was confirmed, 24-23.

[5] The Senate never reached this nomination, as it was tied to the effort to advance Fortas to Chief Justice.

*From* Swindler at 536.

## TABLE 3.—PRIOR JUDICIAL EXPERIENCE OF U.S. SUPREME COURT JUSTICES AND THEIR SUBSEQUENT SERVICE

| Justice | Year Nominated | Number of Years of Prior Judicial Experience | | | Years of Service on Supreme Court |
|---|---|---|---|---|---|
| | | Federal | State | Total | |
| Jay* | 1789 | 0 | 2 | 2 | 6 |
| J. Rutledge*† | *1789 and 1795 | 0 | 6 | 6 | **2 |
| Cushing | 1789 | 0 | 29 | 29 | 21 |
| Wilson | 1789 | 0 | 0 | 0 | 9 |
| Blair | 1789 | 0 | 11 | 11 | 7 |
| Iredell | 1790 | 0 | ½ | ½ | 9 |
| T. Johnson | 1791 | 0 | 1½ | 1½ | 2 |
| Paterson | 1793 | 0 | 0 | 0 | 13 |
| S. Chase | 1796 | 0 | 8 | 8 | 15 |
| Ellsworth* | 1796 | 0 | 5 | 5 | 4 |
| Washington | 1798 | 0 | 0 | 0 | 31 |
| Moore | 1799 | 0 | 1 | 1 | 5 |
| Marshall * | 1801 | 0 | 0 | 0 | 34½ |
| W. Johnson | 1804 | 0 | 6 | 6 | 30 |
| Livingston | 1806 | 0 | 0 | 0 | 17 |
| Todd | 1807 | 0 | 6 | 6 | 20 |
| Story | 1811 | 0 | 0 | 0 | 34 |
| Duval | 1811 | 0 | 6 | 6 | 24 |
| Thompson | 1823 | 0 | 16 | 16 | 20 |
| Trimble | 1826 | 9 | 2 | 11 | 2 |

## Table 3.—Prior Judicial Experience of U.S. Supreme Court Justices and Their Subsequent Service—Continued

| Justice | Year Nominated | Number of Years of Prior Judicial Experience | | | Years of Service on Supreme Court |
|---|---|---|---|---|---|
| | | Federal | State | Total | |
| McLean | 1829 | 0 | 6 | 6 | 32 |
| Baldwin | 1830 | 0 | 0 | 0 | 14 |
| Wayne | 1835 | 0 | 5 | 5 | 32 |
| Taney* | 1836 | 0 | 0 | 0 | 28 |
| Barbour | 1836 | 6 | 2 | 8 | 5 |
| Catron | 1837 | 0 | 10 | 10 | 28 |
| McKinley | 1837 | 0 | 0 | 0 | 15 |
| Daniel | 1841 | 4 | 0 | 0 | 19 |
| Nelson | 1845 | 0 | 22 | 22 | 27 |
| Woodbury | 1845 | 0 | 6 | 6 | 6 |
| Grier | 1846 | 0 | 13 | 13 | 24 |
| Curtis | 1851 | 0 | 0 | 0 | 6 |
| Campbell | 1853 | 0 | 0 | 0 | 8 |
| Clifford | 1858 | 0 | 0 | 0 | 23 |
| Swayne | 1862 | 0 | 0 | 0 | 19 |
| Miller | 1862 | 0 | 0 | 0 | 28 |
| Davis | 1862 | 0 | 14 | 14 | 15 |
| Field | 1863 | 0 | 6 | 6 | 34½ |
| S. P. Chase* | 1864 | 0 | 0 | 0 | 9 |
| Strong | 1870 | 0 | 11 | 11 | 10 |
| Bradley | 1870 | 0 | 0 | 0 | 22 |
| Hunt | 1872 | 0 | 8 | 8 | 10 |
| Waite* | 1874 | 0 | 0 | 0 | 14 |
| Harlan, Sr. | 1877 | 0 | 1 | 1 | 34 |
| Woods | 1880 | 12 | 0 | 12 | 7 |
| Matthews | 1881 | 0 | 4 | 4 | 8 |
| Gray | 1881 | 0 | 18 | 18 | 21 |
| Blatchford | 1882 | 15 | 0 | 15 | 11 |
| L. Q. C. Lamar | 1888 | 0 | 0 | 0 | 5 |
| Fuller* | 1888 | 0 | 0 | 0 | 22 |
| Brewer | 1889 | 6 | 22 | 28 | 21 |
| Brown | 1890 | 16 | 0 | 16 | 16 |
| Shiras | 1892 | 0 | 0 | 0 | 11 |
| H. E. Jackson | 1893 | 7 | 0 | 7 | 2 |
| White* | *1894 and 1910 | 0 | 1½ | 1½ | 27 |
| Peckham | 1895 | 0 | 9 | 9 | 14 |
| McKenna | 1898 | 5 | 0 | 5 | 27 |
| Holmes | 1902 | 0 | 20 | 20 | 30 |
| Day | 1903 | 4 | 3 | 7 | 19 |
| Moody | 1906 | 0 | 0 | 0 | 4 |
| Lurton | 1909 | 16 | 10 | 26 | 5 |
| Hughes*†† | *1910 and 1930 | 0 | 0 | 0 | 17 |
| Van Devanter | 1910 | 7 | 1 | 8 | 27 |
| J. R. Lamar | 1910 | 0 | 2 | 2 | 6 |
| Pitney | 1912 | 0 | 11 | 11 | 10 |
| McReynolds | 1914 | 0 | 0 | 0 | 27 |
| Brandeis | 1916 | 0 | 0 | 0 | 23 |
| Clarke | 1916 | 2 | 0 | 2 | 6 |
| Taft* | 1921 | 8 | 5 | 13 | 9 |
| Sutherland | 1922 | 0 | 0 | 0 | 16 |
| Butler | 1922 | 0 | 0 | 0 | 17 |

TABLE 3.—PRIOR JUDICIAL EXPERIENCE OF U.S. SUPREME COURT JUSTICES AND THEIR SUBSEQUENT SERVICE—Continued

| Justice | Year Nominated | Number of Years of Prior Judicial Experience | | | Years of Service on Supreme Court |
|---|---|---|---|---|---|
| | | Federal | State | Total | |
| Sanford | 1923 | 14 | 0 | 14 | 7 |
| Stone*†† | *1923 and 1941 | 0 | 0 | 0 | 23 |
| Roberts | 1930 | 0 | 0 | 0 | 15 |
| Cardozo | 1932 | 0 | 18 | 18 | 6 |
| Black | 1937 | 0 | 1½ | 1½ | 34 |
| Reed | 1937 | 0 | 0 | 0 | 19 |
| Frankfurter | 1939 | 0 | 0 | 0 | 23 |
| Douglas | 1939 | 0 | 0 | 0 | 36 |
| Murphy | 1940 | 0 | 7 | 7 | 9 |
| Byrnes | 1941 | 0 | 0 | 0 | 1 |
| R. H. Jackson | 1941 | 0 | 0 | 0 | 13 |
| W. Rutledge | 1943 | 4 | 0 | 4 | 6 |
| Burton | 1945 | 0 | 0 | 0 | 13 |
| Vinson* | 1946 | 5 | 0 | 5 | 7 |
| Clark | 1949 | 0 | 0 | 0 | 18 |
| Minton | 1949 | 8 | 0 | 8 | 7 |
| Warren* | 1953 | 0 | 0 | 0 | 16 |
| Harlan | 1955 | 1 | 0 | 1 | 16 |
| Brennan | 1956 | 0 | 7 | 7 | ..... |
| Whittaker | 1957 | 3 | 0 | 3 | 5 |
| Stewart | 1958 | 4 | 0 | 4 | ..... |
| White | 1962 | 0 | 0 | 0 | |
| Goldberg | 1962 | 0 | 0 | 0 | 3 |
| Fortas | 1965 | 0 | 0 | 0 | 4 |
| Marshall | 1967 | 3½ | 0 | 3½ | ..... |
| Burger* | 1969 | 13 | 0 | 13 | |
| Blackmun | 1970 | 11 | 0 | 11 | ..... |
| Powell | 1971 | 0 | 0 | 0 | ..... |
| Rehnquist | 1971 | 0 | 0 | 0 | ..... |
| Stevens | 1975 | 5 | 0 | 5 | ..... |

* Indicates Chief Justice and date of his appointment or promotion.

† Rutledge's nomination was rejected by the Senate in December 1795, but he had served as Chief Justice under a recess appointment for four months.

** Actually Rutledge never served as Associate Justice, although he did perform circuit duty before his resignation in 1791.

†† Indicates no judicial experience when appointed as *Associate* Justice.

*From* Abraham at 45–47.

## TABLE 4.—OCCUPATIONS[*] OF SUPREME COURT DESIGNEES AT TIME OF APPOINTMENT[†]

| Occupation | Number |
|---|---|
| Federal Officeholder in Executive Branch | 22 |
| Judge of Inferior Federal Court | *** 21 |
| Judge of State Court | 21 |
| Private Practice of Law | 18 |
| U.S. Senator | 8 |
| U.S. Representative | 4 |
| State Governor | 3 |
| Professor of Law | 3 |
| Associate Justice of U.S. Supreme Court ** | 2 |
| Justice of the Permanent Court of International Justice | 1 |

[*] Many of the appointees had held a variety of federal or state offices, or even both, prior to their selection.

[†] In general the appointments from state office are clustered at the beginning of the Court's existence; those from federal office are more recent.

[**] Justices White and Stone, who were *promoted* to the Chief Justiceship in 1910 and 1930, respectively.

[***] Does not include Justice John Paul Stevens, appointed 1975, formerly a judge of the U.S. Court of Appeals for the Seventh Circuit.

*From* Abraham at 53.

## TABLE 5.—ACKNOWLEDGED RELIGION OF THE 100 INDIVIDUAL JUSTICES OF THE SUPREME COURT (AT TIME OF APPOINTMENT)*

| Religion | Number |
|---|---|
| Episcopalian | 26 |
| Unspecified Protestant | 24 |
| Presbyterian | 17 |
| Roman Catholic | 6 |
| Unitarian | 6 |
| Baptist | 5 |
| Jewish | 5 |
| Methodist | 4 |
| Congregationalist | 3 |
| Disciples of Christ | 2 |
| Lutheran | 1 |
| Quaker | 1 |
| | 100 |

*Does not include Justice John Paul Stevens, appointed 1975.

*From* Abraham at 57.

## Table 6.—The 31 States from Which the 103 Supreme Court Appointments Were Made

| State | Appointments | State | Appointments |
|---|---|---|---|
| New York | 15 | Minnesota | 2 |
| Ohio | 9 | North Carolina | 2 |
| Massachusetts | 8 | Iowa | 2 |
| Virginia | 7 | Michigan | 2 |
| Tennessee | 6 | New Hampshire | 1 |
| Pennsylvania | 6 | Maine | 1 |
| Kentucky | 5 | Mississippi | 1 |
| Maryland | 4 | Kansas | 1 |
| New Jersey | 4 | Wyoming | 1 |
| South Carolina | 3 | Utah | 1 |
| Connecticut | 3 | Texas | 1 |
| Georgia | 3 | Indiana | 1 |
| Alabama | 3 | Missouri | 1 |
| California | 3 | Colorado | 1 |
| Illinois | *3 | Arizona | 1 |
| Louisiana | 2 | | |

*John Paul Stevens, who received the 104th successful presidential appointment to the Court, was from Illinois, thus raising that State's total to four.

*From* Abraham at 56.

### TABLE 7.—OCCUPATIONAL BACKGROUNDS OF SUPREME COURT NOMINEES SINCE 1937

| Nominee | Last occupation before appointment | Major occupation |
|---|---|---|
| Black | U.S. Senator | Politics. |
| Douglas | Securities and Exchange Commission | Law and teaching. |
| Frankfurter | Law school instructor | Law school instructor. |
| Reed | Solicitor General | Executive branch and private practice. |
| Jackson | Attorney General | Executive branch and private practice. |
| Stone | Supreme Court Justice | Executive branch and private practice. |
| Byrnes | U.S. Senator | Politics. |
| Murphy | Attorney General | Politics. |
| Rutledge | Appellate court | Law school dean and instructor. |
| Burton | U.S. Senator | Politics and private practice. |
| Vinson | Secretary of Treasury | Politics. |
| Minton | Appellate court | Politics. |
| Clark | Attorney General | Executive branch and private practice. |
| Warren | State Governor | Politics. |
| Harlan | Appellate court | Private practice. |
| Brennan | State court | Private practice and State judge. |
| Stewart | Appellate court | Private practice. |
| Whittaker | Appellate court | Private practice. |
| White | Assistant Attorney General | Private practice. |
| Goldberg | Secretary of Labor | Private practice. |
| Fortas | Private practice | Private practice with some experience in executive branch. |
| Marshall | Solicitor General | NAACP attorney and Federal bench. |
| Thornberry | Appellate court | Politics. |
| Burger | Appellate court | Private practice. |
| Haynsworth | Appellate court | Private practice. |
| Carswell | Appellate court | Private practice. |
| Blackmun | Appellate court | Private practice. |
| Powell | Private practice | Private practice. |
| Rehnquist | Assistant Attorney General | Private practice. |
| Stevens | Appellate court | Private practice. |

*Adapted from* Ashby at 453.

# BIBLIOGRAPHY

H. Abraham, Justices and Presidents: A Political History of Appointments to the Supreme Court (1974).

H. Abraham and E. Goldberg, *A Note on the Appointment of Justices of the Supreme Court of the United States,* 46 A.B.A. J. 147 (1960).

American Bar Association, The Standing Committee on Federal Judiciary: What It Is and How It Works (1977).

J. Ashby, "Supreme Court Appointments Since 1937" (1972) (unpublished Notre Dame Ph.D. thesis, Library of Congress).

E. Dennis, *Overcoming Occupational Heredity at the Supreme Court,* 66 A.B.A. J. 41 (1980).

J. Frank, *The Appointment of Supreme Court Justices: Prestige, Principles and Politics,* 1941 Wisc. L. Rev. 172, 343, 461 (1941).

J. Goff, *The Rejection of United States Supreme Court Appointments,* 5 Am. J. Legal Hist. 357 (1961).

J. Grossman, Lawyers and Judges: The ABA and the Politics of Judicial Selection (1965).

W. Murphy and C. Pritchett, Courts, Judges and Politics: An Introduction to the Judicial Process (1961).

S. Padover, To Secure These Blessings (1970).

W. Rogers, *Judicial Appointments in the Eisenhower Administration,* 41 J. Am. Jud. Soc. 38 (1957).

A. Rubin, *Judicial Review in the United States,* 40 La. L. Rev. 67 (1979).

J. Schmidhauser, Judges and Justices: The Federal Appellate Judiciary (1979).

G. Schubert, Constitutional Politics: The Political Behavior of Supreme Court Justices and The Constitutional Policies They Make (1960).

D. Shapiro, *Mr. Justice Rehnquist: A Preliminary View,* 90 Harv. L. Rev. 293 (1976).

W. Swindler, *The Politics of "Advice and Consent,"* 56 A.B.A. J. 533 (1970).

S. Teger, "Presidential Strategy for the Appointment of Supreme Court Justices" (1976) (unpublished U. of Rochester Ph.D. thesis, Library of Congress).

L. Walsh, *Selection of Supreme Court Justices,* 56 A.B.A. J. 555 (1970).

B. Woodward and S. Armstrong, The Brethren: Inside the Supreme Court (1979).

B. Wukasch, *The Abe Fortas Controversy: A Research Note on the Senate's Role in Judicial Selection,* 24 W. Pol. Q. 24 (1971).